**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

KIMBERLY MARIE R.,

                                        Plaintiff,

              v.

                                                          No. 6:21-CV-775
COMMISSIONER OF SOCIAL SECURITY,                          (CFH)

                                        Defendant.

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**APPEARANCES:**                        **OF COUNSEL:**

Office of Peter M. Hobaica, LLC         B. BROOKS BENSON, ESQ.
2045 Genesee Street
Utica, New York 13501
Attorney for plaintiff

Social Security Administration          TIMOTHY SEAN BOLEN, ESQ.
J.F.K. Federal Building, Room 625
15 New Sudbury Street
Boston, Massachusetts 02203
Attorney for defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

                **MEMORANDUM-DECISION AND ORDER**[1]

        Kimberly[2] Marie R.[3] ("plaintiff") brings this action pursuant to 42 U.S.C. § 405(g)

seeking review of a decision by the Commissioner of Social Security ("the

─────────────────────

[1] Parties consented to direct review of this matter by a Magistrate Judge pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 72.2(b), and General Order 18.  See Dkt. No. 5.
[2] Plaintiff's first name is Kimberly.  See Dkt. No. 12 at 5; Dkt. No. 15 at 1.  The Clerk of Court is directed to amend the docket accordingly.
[3] In accordance with guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in 2018 to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify plaintiff's last name by initial only.

Commissioner") denying her applications for disability insurance and social security income benefits.  See Dkt. No. 1 ("Compl.").  Plaintiff moves for reversal and remand for the determination of benefits.  See Dkt. No. 12.  The Commissioner cross moves for judgment on the pleadings.  See Dkt. No. 15.  For the following reasons, the Commissioner's decision is affirmed.

## I. Background

On April 29, and September 28, 2016, plaintiff filed Title II and Title XVI applications for disability insurance and social security income benefits.  See T. at 377-80.[4]  Plaintiff alleged a disability onset date of December 20, 2015.  See id. at 472.  The Social Security Administration ("SSA") denied plaintiff's claims on August 17, 2016.  See id. at 213.  Plaintiff requested a hearing, see id. at 225, and a hearing was held before Administrative Law Judge ("ALJ") Elizabeth W. Koennecke.  See id. at 78-117.  On January 10, 2019, the ALJ issued an unfavorable decision.  See id. at 188-200.  The Appeals Council reviewed and remanded the ALJ's decision.  See id. at 207-209.  ALJ Koennecke held a hearing on remand on August 26, 2020, and a supplemental hearing on September 15, 2020.  See id. at 118-71.  The ALJ issued a second unfavorable decision on October 8, 2020.  See id. at 16-36.  The Appeals Council denied plaintiff's request for review on May 5, 2021.  See id. at 1-5.  Plaintiff timely commenced this action on June 7, 2021.  See Compl.

---

[4] "T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner.  See Dkt. No. 6.  Citations to the administrative transcript refer to the pagination in the bottom, right-hand corner of the page, not the pagination generated by CM/ECF.

## II. Legal Standards

### A. Standard of Review

In reviewing a final decision of the Commissioner, a district court may not

determine de novo whether an individual is disabled.  See 42 U.S.C. §§ 405(g),

1388(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir.

1990).  Rather, the Commissioner's determination will only be reversed if the correct

legal standards were not applied or it was not supported by substantial evidence.  See

Johnson v. Bowen, 817 F.2d 983, 985-86 (2d Cir. 1987); Berry v. Schweiker, 675 F.2d

464, 467 (2d Cir. 1982).  Substantial evidence is "more than a mere scintilla," meaning

that in the record one can find "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  Halloran v. Barnhart, 362 F.3d 28, 31 (2d

Cir. 2004) (per curiam) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal

citations omitted)).  The substantial evidence standard is "a very deferential standard of

review . . . .  [This] means once an ALJ finds facts, we can reject [them] only if a

reasonable factfinder would have to conclude otherwise."  Brault v. Soc. Sec. Admin.,

Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (internal quotations marks,

citation, and emphasis omitted).  Where there is reasonable doubt as to whether the

Commissioner applied the proper legal standards, the decision should not be affirmed

even though the ultimate conclusion is arguably supported by substantial evidence.

See Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing Johnson, 817

F.2d at 986.  However, if the correct legal standards were applied and the ALJ's finding

is supported by substantial evidence, such finding must be sustained "even where

substantial evidence may support the plaintiff's position and despite that the court's

independent analysis of the evidence may differ from the [Commissioner's]." <u>Rosado v.</u>
<u>Sullivan</u>, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted).

### B. Determination of Disability

"Every individual who is under a disability shall be entitled to a disability . . .
benefit . . . ." 42 U.S.C. § 423(a)(1)(E).  Disability is defined as the "inability to engage
in any substantial gainful activity by reason of any medically determinable physical or
mental impairment . . . which has lasted or can be expected to last for a continuous
period of not less than 12 months[.]" <u>Id.</u> § 423(d)(1)(A).  A medically-determinable
impairment is an affliction that is so severe that it renders an individual unable to
continue with his or her previous work or any other employment that may be available to
him or her based upon age, education, and work experience.  <u>See id.</u> § 423(d)(2)(A).
Such an impairment must be supported by "medically acceptable clinical and laboratory
diagnostic techniques." <u>Id.</u> § 423(d)(3).  Additionally, the severity of the impairment is
"based on objective medical facts, diagnoses[,] or medical opinions inferable from [the]
facts, subjective complaints of pain or disability, and educational background, age, and
work experience." <u>Ventura v. Barnhart</u>, No. 04-CV-9018 (NRB), 2006 WL 399458, at *3
(S.D.N.Y. Feb. 21, 2006) (citing <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1037 (2d Cir.
1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R.
§ 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity.
>
> If he [or she] is not, the [Commissioner] next considers
> whether the claimant has a "severe impairment" which

significantly limits his [or her] physical or mental ability to do basic work activities.

If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.

Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.

Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added).  "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further."  Barnhart v. Thomas, 540 U.S. 20, 24 (2003).  The plaintiff bears the initial burden of proof to establish each of the first four steps.  See DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere.  Id. (citing Berry, 675 F.2d at 467).

### III. The ALJ's Decision

Applying the five-step disability sequential evaluation, the ALJ first determined that plaintiff had not engaged in substantial gainful activity since July 22, 2016.  See T.

at 19.  The ALJ explained that "although [plaintiff] alleges disability beginning on

December 20, 2015, she testified that she continued to work until July 22, 2016."  Id.

The ALJ "conclude[d] that since her alleged onset date of December 20, 2015 until July

22, 2016, there was no continuous 12-month period in which [plaintiff] had not engaged

in substantial gainful activity, and that she consistently worked until July 2016."  Id.

However, the ALJ stated that "there has been a continuous 12-month period[] during

which [plaintiff] did not engage in substantial gainful activity.  The remaining findings

address the period(s) [plaintiff] did not engage in substantial gainful activity."  Id. at 20.

At step two, the ALJ found that plaintiff had the following severe impairments:

"fibromyalgia affecting both arms, bilateral arm impairments, degenerative disc disease

of the cervical and lumbar spine, mental diagnoses generally characterized as bipolar

disorder, generalized anxiety disorder, depressive disorder, and substance use

disorder[.]"  T. at 20.  At step three, the ALJ determined that plaintiff did not have an

impairment or combination of impairments that met or medically equaled the severity of

one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See id. at

22.  Before reaching step four, the ALJ concluded that plaintiff retained the residual

functional capacity ("RFC") to perform light work as defined in 20 C.F.R.

§§ 404.1567(b), 416.967(b) except

> she can lift, carry, push, and pull up to 20 pounds occasionally and 10
> pounds frequently.  She can sit for six hours in an eight-hour workday
> for one hour at one time with a brief stretch break.  She can stand for
> three hours in an eight-hour workday for 30 minutes at one time with a
> brief stretch break.  She can walk for three hours in an eight-hour workday
> for 30 minutes at one time with a brief stretch break.  She can frequently
> reach in all directions at shoulder level.  She can occasionally reach
> overhead.  She can frequently finger, handle, and feel. She can
> occasionally engage in postural activities. She can occasionally work at
> unprotected heights.  She can operate a motor vehicle.  She retains the

6

ability to: understand and follow simple instructions and directions; perform simple tasks independently; maintain attention and concentration for simple tasks; regularly attend to a routine and maintain a schedule; handle simple, repetitive work-related stress in that she can make occasional decisions directly related to the performance of simple tasks in a position with consistent job duties that does not require her to supervise or manage the work of others; should avoid work requiring more complex interaction or joint effort to achieve work goals; and can tolerate superficial contact with the public.

Id. at 24.  At step four, the ALJ determined that plaintiff was unable to perform past relevant work.  See id. at 33.  At step five, considering plaintiff's age, education, work experience, and RFC, the ALJ concluded that there were jobs that existed in significant numbers in the national economy that plaintiff could perform.  See id. at 34.  Thus, the ALJ determined that plaintiff had "not been under a disability, as defined in the Social Security Act, from December 20, 2015, through the date of th[e] decision[.]"  Id. at 35.


### IV. Arguments[5]

Plaintiff argues that (1) the ALJ failed to properly consider plaintiff's fibromyalgia and the resulting symptoms; (2) the ALJ did not provide "good reasons" for declining to give controlling weight to plaintiff's treating providers' opinions; (3) the ALJ erred in determining that plaintiff's fibromyalgia did not meet a Listing; (4) the ALJ's RFC determinations are not supported by substantial evidence; (5) the ALJ's mental health Listings determination was erroneous; and (6) the ALJ did not properly consider plaintiff's testimony and activities of daily living.  Dkt. No. 12 at 12-29.  The

---

[5] The Court's citations to the parties' briefs refer to the pagination generated by CM/ECF in the pages' headers.

Commissioner asserts that in all aspects of the ALJ's decision raised by plaintiff, the determinations are supported by substantial evidence.  See generally Dkt. No. 15.


## V.  Discussion

### A.  Plaintiff's Fibromyalgia

Plaintiff contends that "[t]he ALJ never mentions SSR 12-2p and appears unaware of it.  Therefore, she never specifically explains why the numerous signs and symptoms of fibromyalgia in the records . . . do not demonstrate [p]laintiff's disability from fibromyalgia."  Dkt. No. 12 at 12.  Plaintiff also argues that this lack of consideration tainted the ALJ's Listings determination.  See id. at 12-18, 20-26.

"Persons afflicted with fibromyalgia may experience severe and unremitting musculoskeletal pain, accompanied by stiffness and fatigue due to sleep disturbances, yet have normal physical examinations . . . ."  White v. Comm'r of Soc. Sec., No. 5:14-CV-1140 (GTS/WBC), 2016 WL 2865724, at *5 (N.D.N.Y. Apr. 21, 2016), report and recommendation adopted, 2016 WL 2858859 (N.D.N.Y. May 16, 2016)  (citation omitted).  For example, a plaintiff may show "full range of motion, no joint swelling, normal muscle strength and normal neurological reactions.  Thus, lack of positive, objective clinical findings does not rule out the presence of fibromyalgia or its symptoms."  Id. (citations omitted).  "SSR 12-2p provides guidance on how ALJ's should evaluate whether fibromyalgia is a medically determinable impairment and how to evaluate its limiting effects.  The ruling recognizes two sets of criteria for diagnosing fibromyalgia."  Wood-Callipari v. Comm'r of Soc. Sec., 5:15-CV-743 (NAM), 2016 WL

3629132, at *3 (N.D.N.Y. June 29, 2016) (quoting Soc. Sec. Ruling ("SSR") 12-2p,

Titles II & Xvi: Evaluation of Fibromyalgia, 2012 WL 3104869, at *2-3 (S.S.A. July 25,

2012)).  Once an ALJ has found a plaintiff's fibromyalgia to be a medically determinable

impairment, the ALJ will

> evaluate the intensity and persistence of the person's pain or any other
> symptoms and determine the extent to which the symptoms limit the
> person's capacity for work.  If objective medical evidence does not
> substantiate the person's statements about the intensity, persistence, and
> functionally limiting effects of symptoms, [the ALJ] consider[s] all of the
> evidence in the case record, including the person's daily activities,
> medications or other treatments the person uses, or has used, to alleviate
> symptoms; the nature and frequency of the person's attempts to obtain
> medical treatment for symptoms; and statements by other people about
> the person's symptoms.

SSR 12-2p, 2012 WL 3104869, at *5.

The cases plaintiff relies on to support her contention that "[t]he ALJ never

properly analyze[d] [her] fibromyalgia signs and symptoms, and how they affect [her]

work ability[,]" are not persuasive.  Dkt. No. 12 at 14.  In each case, this Court

remanded for the ALJ to determine whether the plaintiff's fibromyalgia was a medically

determinable impairment or whether it was a severe impairment after determining that

the ALJ erred by not considering both sets of criteria under SSR 12-2p.  See id.; see

also Kirah D. v. Berryhill, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *7 (N.D.N.Y.

Feb. 13, 2019) ("The ALJ found that [the] plaintiff failed to m[e]et the criteria set forth in

Section II.A., and noted that 'symptoms by themselves are insufficient to establish a

medically determinable impairment.'  Therefore, the ALJ's decision does not suggest a

proper analysis of the medical determinability of fibromyalgia under SSR 12-2p because

it does not appear that the ALJ considered [the] plaintiff's fibromyalgia under both

sections of SSR 12-2p."); Angelina R. v. Saul, No. 3:18-CV-471 (DJS), 2019 WL

3067515, at *4 (N.D.N.Y. July 12, 2019) (explaining that the ALJ's "review is relevant only to the first of the two criteria in SSR 12-2p.  The analysis, however, does not show consideration of the specific factors in the second of the criteria under 12-2p.  The ALJ's severity analysis does not discuss [the p]laintiff's history of pain, the presence or, for that matter the absence of, fibromyalgia symptoms, or the possibility that other disorders could be causing such symptoms or have been excluded as a cause."); Susan C. v. Saul, No. 5:18-CV-00545 (TJM), 2019 WL 4643717, at *5-6 (N.D.N.Y. Sept. 24, 2019) ("The ALJ did not examine whether [the p]laintiff's fibromyalgia amounted to a [medically determinable impairment] under the standard set forth in SSR 12-2p.  The ALJ only mentions fibromyalgia twice in her decision. . . .  [T]he assessment of the effects of [the p]laintiff's fibromyalgia, and the impact it had on [the p]laintiff's ability to engage in activities of daily living, appears to be based upon a specific time frame but not on the longitudinal record.").

Here, the ALJ determined that plaintiff's fibromyalgia was a medically determinable impairment and that it was severe.  See T. at 20.  The ALJ explained that plaintiff was diagnosed with fibromyalgia in 2006 and during the consultive examination in August 2016, she had "a total of 14 trigger points" and is "prescribed Lyrica."  Id. (citing T. at 723).  The ALJ stated that "[b]y finding [plaintiff's] fibromyalgia to be 'severe,' the undersigned has considered every pain complaint related to every part of her body."  Id. at 22.  The ALJ also discussed plaintiff's fibromyalgia at the subsequent sequential steps of the evaluation.  See id. at 23, 25-32.  The relevant inquiry, then, is whether the ALJ appropriately considered plaintiff's fibromyalgia at each of the subsequent steps.

### 1. Step-three Determination Related to Fibromyalgia

Plaintiff contends that the ALJ erred at step three by failing to find that plaintiff's fibromyalgia met Listing 14.09(D) for inflammatory arthritis.  See Dkt. No. 12 at 20-21. At step three, the ALJ explained that "[t]here is no listing in Appendix 1 for fibromyalgia, and the evidence does not suggest that [plaintiff's] fibromyalgia is of sufficient severity to warrant a medical expert opinion as to whether her fibromyalgia medically equals a listing."  T. at 23.  The ALJ referenced plaintiff's attorney's brief in which the attorney "conclude[d] that [plaintiff] suffered repeated manifestations of her fibromyalgia."  Id. (citing T. at 550).  The ALJ stated, however, that plaintiff's "treating source noted that her fibromyalgia symptoms were better while treating with Lyrica, allowing her to be more active.  In August 2020, she denied experiencing any joint swelling or myalgia. Updated neurosurgical records indicated that [plaintiff] had no tenderness to palpation." Id. (citing T. at 667, 1461, 1619).  The ALJ also noted that plaintiff "reported to doing 23/46 of the high peak hikes and that she actively hiked during all seasons as of 2017." Id.  The ALJ concluded that "[t]he ability to hike in slipper[y], icy, cold, and steep conditions in the Adirondacks more than a year after her alleged onset date of disability is not consistent with the [] conclusion that she medically equals the requirements of the listing."  Id.

"[L]ongstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight."  SSR 96-6-p, Titles II & Xvi: Consideration of Admin. Findings of Fact by State Agency Med. & Psychological

11

Consultants & Other Program Physicians & Psychologists at the Admin. L. Judge & Appeals Council, 1996 WL 374180, at *3 (S.S.A. July 2, 1996); see Bradley W. v. Comm'r of Soc. Sec., No. 5:19-CV-1217 (ATB), 2020 WL 5848833, at *7 (N.D.N.Y. Oct. 1, 2020) ("[O]n March 27, 2017, the Social Security Administration issued a new Social Security Ruling governing [] step three adjudications.  SSR 17-2p rescinded and replaced SSR 96-6p.).[6]  "The signature of a State agency medical [] consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) . . . ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review."  SSR 96-6p, 1996 WL 374180, at *3.  An ALJ is not required to "obtain an updated medical opinion from a medical expert" unless "no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable" or "additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments."  Id. at *3-4.

Here, single-decision maker Dawn Szymanksi considered Listing 14.09 and determined that plaintiff's impairments did not meet the Listing.  See T. at 178, 181.

---

[6] The Commissioner references SSR 17-2p, however, the relevant regulations are those that were in effect at the time plaintiff applied her benefits.  See Dkt. No. 15 at 8-10; see also Wood v. Colvin, 987 F. Supp. 2d 180, 194, n.10 (N.D.N.Y. 2013) (citation omitted) ("For the purposes of the Court's review, however, the Court applies the regulations that were in effect at the time [the plaintiff] applied for disability benefits.").

Plaintiff does not argue why the ALJ would have been required to obtain an additional medical expert but instead states that "[t]he ALJ could have obtained 'a medical expert opinion as to whether [plaintiff's] fibromyalgia medically equals a Listing' but did not." Dkt. No. 12 at 21. Such a statement is insufficient to show error where the state agency consultant considered the applicability of Listing 14.09.

Further, as to whether plaintiff's fibromyalgia meets a Listing, plaintiff bears the burden of proof. See Vann v. Comm'r of Soc. Sec., No. 7:15-CV-0094, 2016 WL 3526076, at *3 (N.D.N.Y. May 27, 2016) ("[The p]laintiff bears the burden of establishing that his [or her] impairments match a Listing or are equal in severity to a Listing."), report and recommendation adopted, 2016 WL 3546362 (N.D.N.Y. June 23, 2016). To meet Listing 14.09(D) plaintiff must have

> Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
>
> > 1. Limitation of activities of daily living.
> > 2. Limitation in maintaining social functioning.
> > 3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 (effective Aug. 12, 2015 to May 23, 2016). Plaintiff asserts that because of her fibromyalgia, she had headaches, nausea, vomiting, constipation, diarrhea, dizziness, fatigue, vision problems, difficulty remembering things, muscle pain, and muscle weakness. See Dkt. No. 12 at 12-13. Plaintiff also contends that she had marked limitations in concentrating and persisting and an extreme limitation in maintaining pace. See id. at 21.

The ALJ considered plaintiff's pain, muscle weakness, dizziness, sleep and vision problems, and activities of daily living. See T. at 25-32. The ALJ noted that

plaintiff "alleged that she is unable to work due to pain throughout her entire body." Id. at 25. The ALJ reviewed plaintiff's testimony in which she explained that "she stopped working because she was making mistakes, dropping things, and not remembering orders. She complained of numbness, tingling, burning, and the lack of strength in her wrists and hands and asserted that she cannot write, do her hair, or perform activities that require holding her arms up." Id. The ALJ further recounted plaintiff's testimony that "[s]he complained of problems turning her head because of tightness in her shoulders, as well as dizziness and problems with balance, resulting in a few falls. She asserted that she has numbness in her legs occasionally, as well as low back and neck pain." Id. Then, "[a]t the August 2020 hearing, [plaintiff] testified that she was receiving injections at her neck every week for the past three months without experiencing any relief. She continues to experience numbness and tingling in her hands daily, which affects her ability grasp objects." Id. As stated by the ALJ, plaintiff also asserted that she "struggles to zip and button things. She stated that her musculoskeletal conditions have worsened since the prior unfavorable decision was rendered and that her providers are considering cervical surgery. [Plaintiff] indicated that she experiences fibromyalgia flare-ups, which leads to stiffness in her back and worsening psychological symptoms." Id. Additionally, the ALJ noted that plaintiff "testified that she has disrupted sleep and wake[s] without feeling rested." Id. at 32 (citing T. at 128-29). The ALJ explained, "[h]owever, [that] in the September 2016, she reported to her treating source that she goes to bed between 6:30 and 9:00 PM and sleep until 5 AM or 6 AM and that she feels rested in the morning and is able to spend the day cleaning the house and doing things without napping." Id. (citing T. at 863).

In reviewing the objective evidence in the record, the ALJ stated that plaintiff "has a history of fibromyalgia, and in August 2016, [plaintiff] had trigger points in her bilateral shoulders, elbows, wrists, back, hips, knees, and ankles for a total of 14 trigger points. She was prescribed Lyrica."  T. at 28 (citing T. at 663-710, 723).

The ALJ stated that "[t]he standing, walking, and sitting abilities outlined [in the RFC] are supported by the physical examinations in record."  T. at 30.  The ALJ noted that during the 2016 consultative examination, plaintiff was not in acute distress, she had a normal gait and stance, she did not use an assistive device, and she did not need help changing for the exam, getting on or off the exam table, or rising from a chair.  See id. at 30, 722.  Plaintiff also had full ranges of motion in her cervical and lumbar spine, shoulders, elbows, forearms, wrists, hips, knees, and ankles.  See id. at 723.  The ALJ noted that the examination showed

> no evident subluxations, contractures, ankylosis, or thickening.  Her joints were stable and nontender with no redness, heat, swelling, or effusion. Her deep tendon reflexes were physiologic and equal in the upper and lower extremities, and no sensory deficit was noted.  Her strength was full in the upper and lower extremities, which showed no cyanosis, clubbing, or edema.  Pulses were physiologic and equal with no significant varicosities or tropic changes.  No muscle atrophy was evident.

Id. at 30 (citing T. at 721-27).  The ALJ explained that "[i]n May 2020, emergency room records indicated that [plaintiff] mild abnormal findings, but her sensation and strength were intact, and coordination was normal.  [Plaintiff] also had normal range of motion, no edema, tenderness, or deformity, normal coordination, and no sensory deficit.  She also denied experiencing any musculoskeletal symptoms."  Id. (citing T. at 1318, 1323-24).

The ALJ acknowledged plaintiff's complaints "that her musculoskeletal symptoms are aggravated by sitting and standing," and stated that she "fully accounted for this complaint by including a sit/stand option within the established residual functional capacity." T. at 30 (citing T. at 1396). The ALJ then recited more objective evidence in the record, noting that "[s]trength testing in August 2020 was normal." Id. (citing T. at 1461). The ALJ recounted that plaintiff was "evaluated in September 2020" and she "had negative straight leg raise test bilaterally, joints were intact, spinal alignment was normal, gait and posture were normal, no assistive devices were required, sensation was intact in the lower extremities, deep tendon reflexes were +2 and symmetric in the lower extremities, and motor strength was grossly intact." Id. (citing T. at 1619).

The ALJ also reviewed the MRI, CT, and X-ray results in the record which revealed, as stated by the ALJ, "disc degeneration with herniation at L5-S1," "a rudimentary disc at the S1-S2 level with no acute fracture or subluxation," "diminished intervertebral disc height with desiccation at the L5-S1 level and without a central disc herniation at this level being identified," "a small central disc protrusion with an annular tear was suspected, which appears to abut without displacement of the right-sided S1 nerve root," and "[m]ild bilateral foraminal narrowing was also suggested at this level." T. at 29 (citing T. at 725, 994, 998, 1007). The ALJ stated that plaintiff "received bilateral sacroiliac joint injections." Id. (citing T. at 893). Then plaintiff "reported [] neck pain, and a cervical spine x-ray performed on August 10, 2016[,] showed a straightening. On May 10, 2018, an MRI scan of the cervical spine showed multilevel degenerative change, straightening of the normal cervical curvature, and disc protrusion at C3-4, C4-5, C5-6, and C6-7 levels." Id. (citing T. at 727, 1141-42). The ALJ

explained that plaintiff's "neck pain was treated with epidural steroid injections at well as radiofrequency ablation." Id. (citing T. at 1617-21).

The ALJ reiterated plaintiff's testimony "that she experienced no relief from injections, heat, and ice" but that her primary care provider Nathanial Gould, M.D., "noted that [plainitff] had good response with most injections to her shoulder, back, and neck." T. at 30 (citing T. at 1450). The ALJ explained that plaintiff's other primary care provider, Toby Taylor, M.D., "indicated that she had very good relief after Lyrica. She also reported to experiencing relief in her shoulder pain, lower back, and deQuervain's after receiving injections. [Plaintiff] was taking Cymbalta with good relief." Id. (citing T. at 1267, 1269, 1271, 1286, 1325, 1379, 1458, 1587). Further, the ALJ stated that plaintiff "indicated that radiofrequency ablation performed on her lower back provided very good relief. [Plaintiff's] treating source noted that her fibromyalgia symptoms were better while treating with Lyrica, allowing her to be more active." Id. (citing. T at 667-70, 1373, 1539).

The ALJ also discussed David Stang, Psy.D.'s, medical opinion. See id. at 28. Dr. Stang determined that plaintiff had extreme limitations in maintaining pace and marked limitations in concentrating and persisting. See id. at 1563. However, the ALJ found that the severity of plaintiff's limitations was inconsistent with the record and that Dr. Stang's opinion was given "limited weight." Id. at 28. The ALJ explained that Dr. Stang's opinion "indicated that [plaintiff] has a severely restricted mental [RFC] due to her psychological impairments. Dr. Stang's conclusion is completely at odds with [plaintiff's] mental health treatment notes. Specifically, counseling records indicated that her psychological symptoms improved with medication, and she reported to feeling

much better and more stable moods." Id. (citing T. at 1172, 1200, 1211).  The ALJ also noted that plaintiff "stated that she was doing well.  The medical examiner described [plaintiff] as pleasant and conversant, and indicated that she was becoming more active." Id. (citing T. at 1200, 1211).  The ALJ further explained that "Dr. Stang noted during his own evaluation of [plaintiff] that while she was anxious and obsessed with her Social Security case, her thought process was organized and goal directed, insight was intact, and judgment was intact.  [His] opinions are also contradicted by the other mental status examinations in record . . . ." Id. (citing T. at 654, 1196, 1200, 1342, 1495, 1577, 1604).

Therefore, contrary to plaintiff's contention that "[t]he ALJ [] never evaluate[d] Dr. Stang's findings," and never considered plaintiff's fibromyalgia signs and symptoms, the ALJ explicitly did so.  Dkt. No. 12 at 20-22.  As discussed in more detail later in this Memorandum-Decision and Order, the ALJ's decision to discount Dr. Stang's extreme and marked limitations is supported by substantial evidence.  See infra at 25-28.  As the ALJ appropriately considered plaintiff's fibromyalgia, the resulting subjective symptoms, and appropriately discounted the marked limitations in mental functioning, the ALJ's step three determination does not warrant remand.  See Flake v. Comm'r of Soc. Sec., No. 15-CV-1128 (GTS/WBC), 2016 WL 7017355, at *6 (N.D.N.Y. Nov. 10, 2016) ("Whether [the p]laintiff has an impairment or combination of impairments that meets or equals a Listing is a determination reserved for the Commissioner."), report and recommendation adopted, 2016 WL 7017396 (N.D.N.Y. Dec. 1, 2016); Maldonado v. Berryhill, No. 16-CV-165 (JLC), 2017 WL 946329, at *22 (S.D.N.Y. Mar. 10, 2017) (finding the ALJ's step-three determination to be supported by substantial evidence

18

where the ALJ "considered multiple 'relative [L]istings' in combination with [the plaintiff's] impairments" and "reviewed [her] mental impairments in combination with her fibromyalgia, making reference to [an] opinion that [found that the plaintiff's] 'pain would frequently interfere with her capacity for attention and concentration, with a moderate limitation in her ability to deal with work stress.'").

### 2. RFC Determination Related to Fibromyalgia

As to step four, an "ALJ's reliance on the lack of objective findings such as range of motion limitations, signs of synovitis, swelling, etc., is not per se error—the ALJ can and should rely on such findings, or a lack thereof, in determining the severity and limiting effects of plaintiff's fibromyalgia." Robert T. S., Jr., v. Comm'r of Soc. Sec., No. 5:21-CV-38 (CFH), 2022 WL 1746968, at *8 (N.D.N.Y. May 31, 2022) (citing LaVonda S. v. Kijakazi, No. 3:20-CV-0483 (DEP), 2021 WL 3884255, at *4 (N.D.N.Y. Aug. 31, 2021)).  However, the ALJ should not consider only a lack of objective evidence—such as range of motion limitations, swelling, and synovitis—without also considering evidence in the record that documents signs of "[w]idespread pain and other symptoms associated with [fibromyalgia], such as fatigue . . . ."  SSR 12-2p, 2012 WL 3104869, at *6; see Melissa P. v. Comm'r of Soc. Sec., No. 5:20-CV-1007 (TJM), 2022 WL 669325, at *8 (N.D.N.Y. Mar. 7, 2022) (emphasis added) ("The Court agrees that the ALJ should not have discounted [the p]laintiff's claims of pain and limitations from her fibromyalgia by referencing a lack of clinical findings concerning gait and motor function.  If the ALJ had based his finding that the opinion was 'unpersuasive' solely on the lack of medical records supporting [the p]laintiff's claims of pain, the Court would agree that the case should be remanded for a clearer explanation of the weight assigned [to the] opinion.

Here, however, the ALJ did not rely <u>only</u> on a lack of objective findings in rejecting [the] opinion.  The ALJ pointed to other evidence of the record, such as [the p]laintiff's own daily activities and other parts of the medical record, like chiropractic treatments, that showed a lack of limitation from fibromyalgia.").

Here, the ALJ considered the evidence across the longitudinal record relating to plaintiff's fibromyalgia including her subjective complaints.  <u>See</u> T. at 20-33.  The ALJ reviewed plaintiff's subjective complaints including the tingling, burning, and lack of strength in her arms, wrists, and hands, and the impact it had on her ability to grasp, reach, zip, and button.  <u>See id.</u> at 25.  The ALJ discussed the tender points showing on examination as well as the examinations in which plaintiff had no tenderness to palpation.  <u>See id.</u> at 28, 30.  The ALJ also considered plaintiff's relatively normal ranges of motion on examination and thoroughly recounted the X-rays, MRI scans, and EMG studies.  <u>See id.</u> at 30-31.  Although the ALJ did not specifically mention SSR 12-2p in her decision, the ALJ found plaintiff's fibromyalgia to be a severe, medically-determinable impairment, and considered plaintiff's alleged "pain throughout her body[,]" her alleged resulting limitations and her activities of daily activities.  <u>Id.</u> at 25.  The ALJ also extensively considered plaintiff's mental limitations, through a review of her subjective complaints, her counseling treatment notes, and the medical opinions.  <u>See</u> <u>id.</u> at 27-28, 31-32.  Accordingly, the Court disagrees with plaintiff's assertion that the ALJ "fail[ed] to discuss the other numerous symptoms and signs [other than her trigger points] . . . affecting most of her body."  Dkt. No. 12 at 13.  Despite plaintiff's allegations of pain, the record indicates that plaintiff's "Fibromyalgia greatly improved with medications[,]" "Lyrica at low does with relief[,]" and she "report[ed] feeling good after

last [physical] therapy visit."  T. at 885, 929, 1112-13.  As the ALJ considered plaintiff's fibromyalgia, the resulting symptoms, and and medical opinions related thereto from across the relevant time period, remand is not warranted.  See Anysha M. v. Comm'r of Soc. Sec., No. 3:19-CV-0271 (CFH), 2020 WL 1955326, at *5 (N.D.N.Y. Apr. 23, 2020) ("The ALJ's references to fibromyalgia and chronic widespread pain throughout her RFC analysis indicate that she properly considered [the p]laintiff's fibromyalgia in determining [the p]laintiff's physical limitations that are supported by the evidence of record.").

### B.  Plaintiff's Mental Health Limitations

Plaintiff next argues that the ALJ erred in finding that plaintiff did not meet Listing 12.04 or 12.06 for her mental impairments.  See Dkt. No. 12 at 26.  Specifically, plaintiff contends that the ALJ addressed Dr. Stang's mental assessment but did not "discuss or evaluate Dr. Stang's extensive 'Psychological Report[].'"  Id. at 27 (citing T. at 1566-1575).  The Commissioner contends that "the ALJ expressly cited to Dr. Stang's report and her decision makes plain that she understood his opinion was based on his report."  Dkt. No. 15 at 18.  The Commissioner further asserts that the ALJ's decision as it relates to plaintiff's mental limitations is supported by substantial evidence where the ALJ "fairly discuss[ed] the evidence and stat[ed] what evidence she credited and discredited."  Id. at 19.

### 1. Relevant Records and ALJ Decision

Dr. Stang first met plaintiff on August 16, 2020, to conduct "a comprehensive psychological evaluation" at the request of "her attorney[.]"  T. at 1566.  During the examination, plaintiff was "initially [] quite outgoing, verbal and displayed a sense of

humor.  She also exhibited a full range of affect." Id. at 1573-74.  Dr. Stang noted that plaintiff "became uncontrollably tearful for brief periods of time when she discussed the emotional abuse that she endured" in her past "as well as the loss of her jobs and her difficulties with her sister." Id. at 1574.  Dr. Stang explained that plaintiff "was very preoccupied with her sister's reported letter and how this letter impacted upon her Social Security claim.  As the interview progressed, her anxiety and depression became more apparent.'" Id.  Plaintiff "struggled to perform Serial 3 exercises" without counting on her fingers and had "moderate deficits at Digit Forward exercises and severe deficits are Digit Backward exercises.  She could only recall 1 out of 3 words after a 5-minute interval." Id.  Dr. Stang stated that plaintiff's "deficits at the mental status exam are consistent with her reported claim of difficulties with multitasking and short-term memory, which are consistent with fibromyalgia." Id.  During the examination, plaintiff's "verbal intellectual abilities seem[ed] to be somewhere within the average to low average range. . . .   In general, her insight and judgment seem[ed] to be intact." Id.

Dr. Stang also reviewed plaintiff's medical records. See T. at 1571-73. Following his review of the records and examination of plaintiff, Dr. Stang concluded that plaintiff's "prognosis . . . appears to be poor to guarded, due to her increased fibromyalgia and depression." Id. at 1575.  Plaintiff "asked" Dr. Stang "to provide psychotherapy for her, which [he] [wa]s willing to begin in the future." Id.  On the same day as the examination, Dr. Stang complete a medical source statement wherein he noted that plaintiff had marked and extreme limitations in numerous areas of functioning. See id. at 1563, 1565.

Plaintiff then began seeing Dr. Stang for mental health counseling on August 25, 2020.  See id. at 1604.  During the first visit, plaintiff's "thought processes were organized, and goal directed.  Her mood was anxious.  She revealed occasionally thinking about her Social Security case, of which she was quite preoccupied.  Her insight and judgment appear[ed] to be intact."  Id.  During her next visit, plaintiff was "ruminating" about her Social Security case and Dr. Stang "encouraged her to continue to get out of her house and walk her dogs as much as possible.  [Dr. Stang] recognized her limitations and her severe physical pain."  Id. at 1606.  In another session a few days later, plaintiff "was highly anxious throughout the session and she acknowledged that the uncertainty of next week's [Social Security] hearing ha[d] exacerbated her anxiety and her depression.  She talked about the need to try to maintain some type of stable and regular routine."  Id. at 1607.  However, Dr. Stang noted that "[b]y the end of the session, she sounded less anxious.  She agreed to therapist suggestion to spend at least one hour a day without thinking about the court hearing by being outside and focusing upon her love of nature."  Id.

The ALJ determined that plaintiff did not have any limitations in understanding, remembering or applying information or interacting with others, moderate limitations in maintaining concentration and persistence, and mild limitations in adapting or managing herself.  See T. at 21.  The ALJ explained that plaintiff's attorney "relie[d] heavily on a mental assessment completed by David Stang, Psy.D., which was completed at the behest of the representative."  Id. at 23.  The ALJ cited to both Dr. Stang's psychological report and medical source statement.  See id.  There were also multiple references made to both the report and medical source statement in plaintiff's attorney's brief to the

ALJ.  See id. at 550-52.  The ALJ explained that "Dr. Stang acknowledged that he has no treatment relationship with [plaintiff] at the time he rendered his opinion."  Id. at 23 (citing T. at 1559-65).  The ALJ stated that Dr. Stang indicated that plaintiff "has a severely restricted mental residual functional capacity due to her psychological impairments.  Dr. Stang's conclusion is completely at odds with [plaintiff's] mental health treatment notes.  Specifically, counseling records indicated that her psychological symptoms improved with medication, and she reported to feeling much better with more stable moods."  Id. (citing T. at 1172, 1200, 1211).  The ALJ recited and relied on treatment records wherein plaintiff stated that she was doing well, she appeared pleasant and conversant, and she had normal thought processes, and intact insight and judgment.  See id. (citing T. at 1172, 1200, 1211, 1289, 1604).  Moreover, the ALJ noted that "[i]n April 2020, [plaintiff] continued to report that she was benefitting from her medications and that she continued to find improvement in her mood."  Id. (citing T. at 1289).  Finally, the ALJ stated that plaintiff's "counseling records and her reports of noted improvement in her symptoms and functioning undermine Dr. Stang's opinion that [plaintiff] had 'no useful ability to function' in several areas of mental activities and met the requirements of the listing.   Accordingly, Dr. Stang's opinion is entitled to limited weight."  Id.

At step four, the ALJ repeated the conclusion that she gave "limited weight to the mental assessment completed by" Dr. Stang and cited to both the examination report and the medical source statement.  T. at 28.  The ALJ also reiterated Dr. Stang's "severely restricted" opinion and it being "at odds" with his mental health treatment notes as well as "the other mental status examinations in the record[.]"  Id. (citing T. at

654, 1172, 1196, 1200, 1211, 40, 1342, 1495, 1577).  The ALJ also acknowledged that plaintiff had previously "received mental health treatment through Upstate Cerebral Palsy and Community Health and Behavioral Services.  Mental status examinations showed dysphoric affect, dysthymic mood, mildly impaired recent and remote memory skills and preoccupied thought content.  She was prescribed psychotropic medications." Id. at 31 (citing T. at 654, 717, 1288-1316, 1601-03).  The ALJ stated that "[m]ore recently, she went to the emergency room for worsening psychological symptoms and insomnia."  Id. (citing T. at 1324-35).

The ALJ explained "[h]owever, [that] the mental status examinations in record do not support the degree of restrictions alleged by [plaintiff]."  T. at 32.  The ALJ then, again, cited to records revealing intact thought process, good judgment, fair attention, and records without a depressed or anxious mood.  See id. (citing T. at 654, 1196, 1200, 1342, 1465, 1577, 1604, 1620).  The ALJ also noted that plaintiff reported that her anxiety was improving, her symptoms were controlled with medication, she was sleeping well, and she had more energy.  See id. at 31-32 (citing T. at 1172, 1184, 1188, 1192, 1196, 1200, 1211, 1602).

### 2.  Analysis

As an initial matter, "[m]edical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 404.1527(a)(1). Dr. Stang's psychological examination report does not include any functional limitations or state what plaintiff "can still do despite [her] impairment[s.]"  Id.; see T. at 1566-75.

As such, it was not a "medical opinion" and the ALJ was not obligated to weigh the report in accordance with 20 C.F.R. § 404.1527(c).  Nevertheless, the ALJ referred to the report  at steps three and four of the sequential evaluation when explaining the limitations identified by Dr. Stang.  See T. at 23-24, 28.  The ALJ explained that Dr. Stang's opinion was fairly extreme and relied on Dr. Stang's treatment notes as well as others in the record to discount the medical source statement.  See id. at 23-24, 28.

Plaintiff is correct in stating that "the ALJ must consider all relevant evidence in [the] case record' in determining whether a listing has been met or equaled under step three."  Brittany F. v. Comm'r of Soc. Sec. Admin., No. 1:18-CV-1365 (ATB), 2020 WL 838076, at *4 (N.D.N.Y. Feb. 19, 2020) (quoting Graf v. Berryhill, No. 3:18-CV-93, 2019 WL 1237105, at *4 (D. Conn. Mar. 18, 2019)); see Dkt. No. 12 at 27.  "Additionally, the ALJ is required to articulate the specific reasons justifying his decision that the claimant does or does not meet the relevant listing."  Graf, 2019 WL 1237105, at *4.  "It is well settled that '[w]here the claimant's symptoms as described by medical evidence appear to match those described in the Listings, the ALJ must explain a finding of ineligibility based on the Listings.'"  Brittany F., 2020 WL 838076, at *4 (quoting Kovacevic v. Chater, No. 94-CV-600, 1995 WL 866425, at *8 (W.D.N.Y. Sept. 28, 1995)) (additional citations omitted).  If "the ALJ failed to adequately 'address or explain why he rejected substantial conflicting record evidence [at step three],'" he will have committed legal error.  Id. at *5 (quoting Cepeda v. Berryhill, No. 18-CV-7304, 2019 WL 7483937, at *14 (S.D.N.Y. Dec. 12, 2019), report and recommendation adopted, 2020 WL 58236 (S.D.N.Y. Jan 6, 2020)).  Here, however, the ALJ appropriately acknowledged at step

three Dr. Stang's contradictory evidence—that plaintiff had severe mental health limitations—and explained why those conclusions were rejected.  See T. at 23-24.

To the extent plaintiff contends that the ALJ only acknowledged the portions of De. Stang's opinion in which he found that plaintiff was "unable to meet competitive standards" but not the "areas where she was 'seriously limited,'" the Court finds no error.  Dkt. No. 12 at 28.  First, the ALJ "was not required" to "recite every limitation opined" "in order to show that every limitation was considered."  Daniel E. v. Kijakazi, No. 6:20-CV-1270 (DEP), 2022 WL 602533, at *6 (N.D.N.Y. Mar. 1, 2022) (citing Brault, 683 F.3d at 448 (acknowledging that "an ALJ is not required to discuss every piece of evidence submitted")).  Second, the ALJ expressly stated that Dr. Stang's opinion "in essence" indicated a "severely restricted" RFC—acknowledging that not every opined limitation was in the most severe category.  T. at 23.  Third, the ALJ clearly explained why she did not adopt the more severe limitations—Dr. Stang did not have a treating relationship with plaintiff at the time of the opinion, his own treatment notes showed normal findings aside from an anxious mood, and the other treatment notes in the record showed improvements in plaintiff's symptoms.  See id. at 23-24.

The ALJ's determination is also supported by substantial evidence.  The ALJ relied on the psychological consultative examination of Jacqueline Santoro, Ph.D., which found mild to moderate limitations in maintaining a regular schedule; and mild limitations in learning new tasks, performing complex tasks, making appropriate decisions, relating to other, and dealing with stress.  See id. at 21-22, 27-28, 717-18; see also Knight v. Astrue, 32 F. Supp. 3d 210, 221 (N.D.N.Y. 2012) ("It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining

State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability.").  Plaintiff identifies no evidence in the record, other than Dr. Stang's initial psychological report, supporting Dr. Stang's extreme limitations.  See Dkt. No. 12 at 25-27.  Rather, as the ALJ explained, the records show consistently normal mental examinations aside from an occasionally anxious or sad mood or affect, and improvement in plaintiff's symptoms through medication and counseling.  See T. at 717, 865, 1172, 1184, 1188, 1192, 1196, 1200, 1211, 1461, 1495, 1514, 1548, 1577, 1602, 1606-07, 1620.  As the ALJ acknowledged contradictory evidence at step three, she clearly explained her reasoning, and the record supports the conclusion that plaintiff did not have more than mild or moderate mental impairments, remand is not warranted on this ground.

### C. Treating Physician Opinion's

Under the relevant regulations, "a treating source's opinion is entitled to controlling weight if [it is] well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record." Erica M. v. Saul, No. 5:18-CV-456 (CFH), 2019 WL 4257165, at *7 (N.D.N.Y. Sept. 9, 2019) (citing 20 C.F.R. § 404.1527(d)(2) (2005); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000)).  "Before a treating physician's opinion can be discounted, the ALJ must provide 'good reasons.'"  Id. (quoting Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)).

> The ALJ is required to assess the following factors in determining how much weight to accord the physician's opinion: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors."

Id. (quoting Schaal, 134 F.3d at 503).  "If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent the opinion is, the less weight it will be given."  Id. (citations omitted).

### 1.  Reaching and Lifting Limitations

Plaintiff argues that the ALJ's determinations that plaintiff can occasionally lift up to twenty pounds, frequently reach at shoulder level, and occasionally reach over head are not supported substantial evidence and to the extent they are inconsistent with the treating providers' opinion, the ALJ did not provide "good reasons" for the deviation. Dkt. No. 12 16-17, 22-23.  Specifically, plaintiff asserts that the ALJ's reliance on a negative straight leg test, normal spinal alignment, gait, and posture, and plaintiff not using an assistive device "hardly is the end of the analysis - - the ALJ fails to explain why she disagrees that [p]laintiff would be limited to lifting/carrying 10 pounds instead of the RFC 20 pound limit."  Id. at 16-17.

### a.  ALJ Decision and Relevant Records

In 2018, Dr. Gould completed a medical source statement wherein he noted, in relevant part, that plaintiff could frequently lift and carry up to ten pounds, occasionally lift and carry eleven to twenty pounds, occasionally reach overhead, handle, finger, and push and pull.  See T. at 1165, 1167, 1171.  Dr. Gould noted that plaintiff could frequently reach other than overhead and feel with both hands.  See id. at 1167.  The ALJ gave the opinion "considerable weight, as it is from a treating source . . . ."  Id. at 26.  In 2020, Dr. Gould submitted a second medical source statement indicating that plaintiff could occasionally lift and carry up to ten pounds, never lift or carry anything

over ten pounds, he could frequently feel with his right and left hands and only occasionally reach, handle, finger, push and pull. See id. at 1451, 1453, 1457. In explaining the reason for the lifting and carrying limitations, Dr. Gould wrote, "disc herniations." Id. at 1451. The ALJ gave the 2020 opinion "partial evidentiary weight" and "accepted the restrictions to the extent they [we]re supported by the objective record." Id. at 26. The ALJ explained that she did "not fully adopt[] the lifting and carrying restriction[s] Dr. Gould identified as they are contradicted by the diagnostic images in record, which showed that [plaintiff's] musculoskeletal impairments remained relatively stable and do not support a deterioration in her lifting/carrying abilities." Id. (citing T. at 1459, 1581, 1584). The ALJ explained that "[t]he greater restrictions identified by Dr. Gould for lifting, carrying, sitting, standing, and walking" were unsupported "by updated neurosurgical records" indicating that plaintiff "had negative straight leg raise test bilaterally, joints were intact, spinal alignment was normal, gait and posture were normal, no assistive devices were required, sensation was intact in the lower extremities, deep tendon reflexes were +2 and symmetric in the lower extremities, and motor strength was grossly intact." Id. (citing T. at 1619).

In 2018, Dr. Taylor opined, in relevant part, that plaintiff could occasionally lift and carry up to twenty pounds and wrote that "more carrying causes pain in the lower back [and indiscernible]." T. at 1260. Dr. Taylor indicated that plaintiff could occasionally reach, handle, finger, feel, push and pull and that her "fibromyalgia required consistent light activity." Id. at 1261. Dr. Taylor submitted a second medical source statement in 2020. See id. at 1598. Dr. Taylor noted, in relevant part, that plaintiff could occasionally lift or carry up to ten pounds, and occasionally reach, handle,

finger, feel, push, and pull.  See id. at 1592, 1594.  Dr. Taylor wrote that this was because of plaintiff's "cervical disc disease[,]" "lumbar[] degeneration[,]" and "fibromyalgia causes fatigue all over ache and depression."  Id. at 1594.  The ALJ explained that "[a]lthough [Dr. Taylor is a] treating provider," he concluded that the opinions were "not entitled to controlling or significant weight, because they are not supported by the objective evidence in record or consistent with [plaintiff's] broad range of daily activities."  T. at 27.  The ALJ stated, "[s]pecifically, Dr. Taylor's opinions are contradicted by the updated diagnostic images in records, which showed at most minimal abnormal findings and that [plaintiff's] condition remained relatively stable during the period under review."  Id. (citing T. at 1459, 1581, 1584).  The ALJ reiterated Dr. Taylor's notation that plaintiff "was engaging in childcare, walking her dogs, running to the grocery store, and preparing meals. . . . [Plaintiff] reported that she went hiking on very high peaks.  The doctor admittedly relied quite heavily on the subjective report of symptoms and limitations provided by [plaintiff] in reaching his opinion."  Id. (T. at 144, 1204, 1250, 1576).  Finally, the ALJ stated that "[i]t is noteworthy that Dr. Taylor is not providing [plaintiff] treatment for her fibromyalgia, chronic pain, or mental disorder, which are the conditions that are the basis of his limitations."  Id. (citing T. at 1576, 1599).

### b.  Analysis

Generally, plaintiff's arguments are asking the Court to reweigh the evidence that was before the ALJ and find that the objective evidence supports her treating providers' opinions, contrary to the ALJ's conclusions.  See Dkt. No 12 at 16.  However, it is not for the Court to reweigh the evidence.  See Cepeda v. Comm'r of Soc. Sec., No. 19-CV-

4936 (BCM), 2020 WL 6895256, at *8 (S.D.N.Y. Nov. 24, 2020) ("[T]he reviewing court's task is limited to determining whether substantial evidence exists to support the ALJ's fact-finding; it may not reweigh that evidence or substitute its judgment for that of the ALJ where the evidence is susceptible of more than interpretation.").

To the extent plaintiff contends that the ALJ did not explain why she adopted the specific lifting and carrying limitation, the Court disagrees. See Dkt. No. 12 at 16. The ALJ explicitly stated that she did not "fully adopt[] the lifting and carrying restriction[s]" in Dr. Gould's 2020 opinion because diagnostic images did "not support a deterioration in her lifting/carrying abilities[]" from Dr. Gould's less-limiting 2018 opinion to his more restrictive 2020 opinion. T. at 26. Therefore, the ALJ gave considerable weight to Dr. Gould's 2018 opinion that plaintiff could occasionally lift and carry twenty pounds and frequently lift or carry up to ten pounds—which are the limitations as stated in plaintiff's RFC. See id. at 25-26. Additionally, the ALJ gave considerable weight to Dr. Gould's 2018 opinion which noted that plaintiff could frequently reach other than overhead, and could occasionally reach overhead—which are the limitations reflected in plaintiff's RFC. See id. at 24, 1167.

Plaintiff also contends that the ALJ did not explain the proposition that Dr. Taylor relied on plaintiff's subjective complaint. See Dkt. No. 12 at 17. The ALJ stated that Dr. Taylor "admittedly relied quite heavily on the subjective report of symptoms and limitations provided by [plaintiff] in reaching his opinion[]" and cited to two treatment records. T. at 27. One treatment record states that plaintiff visited Dr. Taylor "for paperwork to be completed for social security disability." Id. at 1250. The other treatment note states, in part, that plaintiff "does not lift anything greater than 10 pounds

32

by her report." Id. at 1576.  Further, in Dr. Taylor's 2020 medical source statement, he wrote "see daily activities on note[,]" and "see reports provided."  Id. at 1593.  The ALJ is not required to explicitly state every part of his rationale and the Court need only be able to glean the ALJ's rationale.  See Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 79 (N.D.N.Y. 2005) (citation omitted) ("Where 'the evidence of record permits [the court] to glean the rationale of an ALJ's decision, [the ALJ is not required to explain] why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'").  The ALJ stated that Dr. Taylor relied on plaintiff's subjective complaints, Dr. Taylor's opinion references his treatment notes, and the notes explicitly states that the lifting limitation is based on plaintiff's "report."  T. at 1576; 27, 1593. Therefore, contrary to plaintiff's assertion, the ALJ did "explain this allegation" and the ALJ's consideration of the lifting and carrying limitations being based on plaintiff's subjective reports is not in error.  Dkt. No. 12 at 17; but see Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003) (citation omitted) (explaining that the plaintiff's provider's reliance on subjective complaints relating to the plaintiff's physical limitations "hardly undermines his opinion as to her functional limitations, as '[a] patient's report of complaints, or history, is an essential diagnostic tool.'"); see also Gorman v. Comm'r of Soc. Sec., No. 5:12-CV-0939 (LEK/ATB), 2013 WL 4049978, at *4 (N.D.N.Y. Aug. 9, 2013) ("Green-Younger stands for the proposition that a treating physician's opinion that is adequately supported by medical evidence is not undermined because the opinion also relies on the claimant's subjective complaints.").

Although a provider is entitled to rely on a plaintiff's subjective reports, the ALJ's determination to not limit plaintiff to lifting or carrying only ten pounds is supported by

substantial evidence.  Both Drs. Gould and Taylor opined in 2018 that plaintiff could occasionally lift or carry up to twenty pounds.  See T. at 1165, 1260.  Other than plaintiff's report to Dr. Taylor that she could not lift more than ten pounds, the record does not evidence a deterioration in plaintiff's functioning from 2018 to 2020 that supports the providers more limiting 2020 opinions.  See id. at 1451, 1576, 1592.  Rather, as the ALJ explained, in the 2016 consultative examination plaintiff had full range of motion and "strength 5/5 in the upper [] extremities."  Id. at 723; 30.  In 2020, the record indicates that plaintiff's "strength was full in the upper extremity, and deep tendon reflexes were +2 bilaterally in the upper extremities."  Id. at 30; see T. at 1495, 1515.  A few months later, plaintiff "had full motor strength in her upper extremities except 4/5 in her left bicep and tricep and 4/5 in her grip strength."  Id. at 30; see T. at 1620.  These records provide "good reasons" for the ALJ's decision to discount Dr. Taylor's opinion as being based only on plaintiff's subjective complaints without supporting medical records.  Cf. Melissa P., 2022 WL 669325, at *8 (emphasis added) ("The ALJ pointed to other evidence of the record, such as [the p]laintiff's own daily activities and other parts of the medical record, like chiropractic treatments, that showed a lack of limitation from fibromyalgia.").

In further reviewing the records that the ALJ cited, the Court notes that plaintiff reported that the pain in her neck was "unchanged" but her back pain had "been rapidly worsening since onset."[7]  T. at 1459.  On examination, plaintiff's neck range of motion

---

[7] Plaintiff states that "Dr. Gould" made the "statement that [p]laintiff's chronic back pain 'has been rapidly worsening since onset[.]'"  Dkt. No. 12 at 16 (citing T. at 1463).  However, the record cite plaintiff provides documents only one of plaintiff's medications.  See T. at 1463.  During that visit, however, under the "subjective" heading plaintiff reported that her back pain "has been rapidly worsening since onset."  Id. at 1459.  There is not a similar notation under the "objective" examination section.  Id. at 1461.

was normal with mild tenderness, she had mild tenderness to palpation of hands, "no tenderness to palpation of the low back with flexion to fingers to the floor, and 30 degrees extension mild pain.  Strength testing reveals 5/5 knee flexion, extension, dorsiflexion, plantarflexion.  There [wa]s subjectively reduced sensation to touch of the toes on the left." Id. at 1461.  An MRI of plaintiff's cervical spine showed diffuse mild degenerative changes with straightening of cervical lordosis, no significant spinal stenosis, mild bilateral neural foraminal narrowing at C6-C7, but "overall appearance is grossly stable from the prior exam." Id. at 1581.  Further, during a visit for an MRI of plaintiff's lumbar spine, she "relate[d] pain becoming progressively worse for the past year and a half.  Also relates bilateral leg numbness extending to the feet." Id. at 1584.  However, Dr. Taylor noted that the MRI "Findings: To be consistent with the prior MRI study, a transitional segment is suggested at the lumbosacral junction designated as S1.  Therefore, on the sagittal images submitted, intervertebral disc levels visualized extend from T11/12 through S1/2." Id.

In a treatment note from August 12, 2020, Dr. Gould indicated that plaintiff's "[r]ight shoulder pain improved with subacromial bursa injection with Toradol last performed 12/6/2018, and currently pain is minimal[,]" "[g]reatly improved, chronic left shoulder pain with bursitis, improved after left subacromial bursa injection with Toradol performed 12/6/2018[,]" "[c]hronic low back pain combination of discogenic pain, bilateral sacroiliitis (left > right) improved after the most recent lateral branch radiofrequency ablation[,]" and "L5/S1 moderate broad-based disc herniation with large right paracentral disc herniation improved on most recent MR study 12/20/17." Id. at 1458-59.  Aside from plaintiff's subjective report that her back pain had worsened since

the onset, plaintiff does not identify records to contradict the ALJ's conclusion that there was no evidence of deterioration and that her condition "remained relatively stable[.]" Id. at 26-27; see Dkt. No. 12 at 16-17.  As such, the Court finds no error in the ALJ's explanation or conclusions on this issue particularly where the ALJ explained and relied on tests that do not support "a deterioration" in plaintiff's abilities and which showed that plaintiff's "condition remained relatively stable during the period under review."  T. at 26-27 (citing T. at 1459, 1581, 1584).  Moreover, the ALJ appropriately relied on, in addition to the treatment records, the consultative examination.  See id. at 26, 721-25; cf. Rolon v. Comm'r of Soc. Sec., 994 F. Supp. 2d 496, 509 (S.D.N.Y. 2014) (quoting Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir.1998)) ("[S]ince the ALJ 'did not cite *any* medical opinion to dispute the treating physician['s] conclusions,' regarding the nature and severity of [the plaintiff's] impairments, the ALJ did not provide good reasons as required by the treating physician rule.").

Finally, plaintiff notes that Dr. Taylor treated plaintiff for her fibromyalgia.  See Dkt. No. 12 at 18; see also T. at 27.  In support of the contention that "Dr. Taylor is not providing [plaintiff] treatment for her fibromylagia," the ALJ cited a record from Dr. Taylor which noted that he practices "Family Medicine [,]" plaintiff's diagnosis is "Fibromylagia[,]" "Dr. Smiley in the past for fibromyalgia.  Treated medically.  Dr. Gould for pain management.  Lyrica 50mg . . .  Celebrex.  Trigger point injections.  Dr. Tim Jones psychiatrist."  T. at 27, 1576; see T. at 27, 1099-1100.  The Commissioner acknowledges that, on this point, "the ALJ's decision was less than precise, as Dr. Taylor's treatment notes reflect that [p]laintiff presented to him with fibromyalgia and depression complaints."  Dkt. No. 15 at 16.

A provider's treatment relationship and specialization are factors the ALJ must "consider . . . in deciding the weight [to] give to any medical opinion."  20 C.F.R. § 404.1527(c)(2), (5).  It does not appear that Dr. Taylor specializes in a specific field of medicine, but that he was treating plaintiff for all of her ailments, including her depression, fibromyalgia, and back pain as her general practitioner.  See T. at 1099-1100, 1576-78.  However, the ALJ appropriately acknowledged that Dr. Taylor was one of plaintiff's treating providers but that he was not a specialist.  See id. at 27; see Rolon, 994 F. Supp. 2d at 508 (quoting 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5)) ("An ALJ should 'generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.'").  Although the ALJ was not entirely correct when discussing what Dr. Taylor treated plaintiff for, the ALJ otherwise provided "good reasons" for rejecting Dr. Gould's 2020 medical source statement and Dr. Taylor's 2018 and 2020 medical source statements relating to lifting and carrying restrictions, and remand is not warranted on this ground.   See O'Connor v. Comm'r of Soc. Sec., No. 19-CV-696 (FPG), 2020 WL 3802792, at *3 (W.D.N.Y. July 7, 2020) (finding that the ALJ offered sufficiently "good reasons" for discounting a treating provider's opinion where the ALJ considered "the amount of medical evidence supporting [the] opinion[,]" "the consistency of [the] opinion with other evidence in the record[,]" and the inconsistency between the opinion and the treatment notes of a specialist.").

## 2.  Time Off-Task and Absenteeism

As to time of task and absenteeism limitations, plaintiff asserts that the ALJ did not provide "good reasons" for his rejection of the limitations.  Dkt. No. 12 at 17.  Plaintiff

asserts that diagnostic images "have nothing to do with time off task or absence from work," plaintiff's depression being in remission "is irrelevant to time of task, and is overcome by the findings of . . . Dr. Stang[,]" "a one-time finding of judgment as 'normal,' conversations as 'good' and no suicidal thoughts is irrelevant to time off task and absence from work[,]" plaintiff's activities of daily living do not support the ALJ's conclusions. Id. at 17-18.

### a. ALJ Decision and Relevant Records

In 2018, Dr. Gould indicated that plaintiff would need to take ten-minute breaks throughout the workday, he would be off task ten percent of the time, and he would miss two days a month. See T. at 1170-71. The ALJ gave the opinion "considerable weight, as it is from a treating source . . . ." Id. at 26. However, the ALJ explained that he did "not accept the assessed limitations with regard to the time [plaintiff] would spend off task, the number of unscheduled breaks that would be required during an eight-hour workday, and her limited ability to handle bilaterally" because the findings were "inconsistent with the record as a whole, including [plaintiff's] very high level of daily activity[.]" Id. In 2020, Dr. Gould noted that plaintiff would need ten-minute breaks throughout the workday, would be off task for ten percent of the day and would miss "about four days" of work per month. Id. at 1456-57. The ALJ gave the opinion "partial evidentiary weight" and "accepted the restrictions to the extent they [we]re supported by the objective record." Id. The ALJ "rejected Dr. Gould's conclusion that [plaintiff] would be off task and absent from work as it is speculative and not based on any objective findings." Id.

In 2018, Dr. Taylor noted that plaintiff would need two to three breaks in an eight-hour workday and the breaks would need to be for one hour.  See T. at 1265.  Further, Dr. Taylor indicated that plaintiff would be off task for twenty-five percent of a workday, that she could "tolerate 2-4 hours of intermittent activity then rest or off task" and attributed this to "'Brain fog' [] trouble with register at work.  Short on register twice at work.  She had trouble taking orders working at bar.  Lose concentration during conversations – what was I talking about."  Id.  When asked how many days plaintiff would miss of work, Dr. Taylor wrote, "N/A."  Id. at 1266.  In 2020, Dr. Taylor noted that plaintiff would be off task for twenty-five percent or more of a workday because of plaintiff's "[d]epression that leads to poor concentration and ability to follow directions.  Poor concentration has led to job performance problems for her in the past."  Id.  Finally, Dr. Taylor noted that plaintiff would miss more than four days of work per month.  See id. at 1598.  The ALJ explained that "Dr. Taylor also categorized [plaintiff's] depression as in partial remission, which is not consistent with the degree of restrictions he identified.  In addition, during the evaluation, Dr. Taylor noted that the claimant's judgment was normal, conversation was described as good, and no suicidal or homicidal ideations were present."  Id. at 27 (citing T. at 1577-78).

Prior to establishing a treating relationship, Dr. Stang opined that plaintiff would need at least a twenty-minute break every hour.  See T. at 1564.  Dr. Stang wrote that plaintiff "cannot function at a menial job for more than an hour due [to] fibromyalgia, herniated disks, which leads to anxiety."  Id.  Dr. Stang determined that plaintiff would be off task for twenty-five percent or more of a workday and she would miss more than four days per month.  See id.  Dr. Stang determined that plaintiff had marked limitations

in concentration and persisting.  See id. at 1563.  The ALJ did not explicitly discuss Dr. Stang's off-task or absenteeism limitations but discounted the opinion for being inconsistent with plaintiff's reports of feeling better and her mental status examinations showing improvement in her symptoms.  See id. at 28.

### b.  Analysis

Dr. Gould does not provide an explanation in his opinions as to why plaintiff would be off task or absent from work.  See T. at 1170-71, 1456-47.  Although Dr. Gould's opinions are based on plaintiff's physical impairments, "there is a conspicuous absence of any mention that [p]laintiff's symptoms render her unable to remain on task while switching positions."  Sandra D. v. Comm'r of Soc. Sec. Admin., No. 5:20-CV-1067 (LEK/ATB), 2022 WL 344058, at *6 (N.D.N.Y. Feb. 4, 2022).  As Dr. Gould did not provide supporting explanations for the time off task or absenteeism limitations, the ALJ appropriately discounted this portion of Dr. Gould's opinion as speculative.  See 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.  The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.").

Dr. Taylor explained that plaintiff's "depression [] leads to poor concentration" which would limit her ability to remain on task.  T. at 1265, 1597.  Dr. Taylor did not explain why in 2018, he wrote "N/A" for the amount of days plaintiff would miss work, but that in 2020, she would miss more than four days per month.  Id. at 1266, 1598.  The ALJ explained that "Dr. Taylor also categorized [plaintiff's] depression as in partial remission, which is not consistent with the degree of restrictions he identified.  In

addition, during the evaluation, Dr. Taylor noted that [plaintiff's] judgment was normal, conversation was described as good, and no suicidal or homicidal ideations were present." T. at 27 (citing T. at 1577-78). As Dr. Taylor indicated that plaintiff's depression caused her concentration issues which resulted in off task limitations, it was the ALJ's duty to reconcile that conclusion with Dr. Taylor's conflicting treatment note showing that plaintiff had intact judgment and her "[r]ecurrent major depressive disorder, in partial remission." Id. at 1578; 1266; see 20 C.F.R. § 404.1527(c)(3) (discussing the ALJ's consideration of the supportability of explanations and evidence provided by an authorizing source). It is not for the Court to reweigh the evidence that was before the ALJ.

As to Dr. Stang, the ALJ discounted his marked limitation in plaintiff's ability to concentrate and persist. See T. at 28. The ALJ stated that "counseling records indicated that [plaintiff's] psychological symptoms improved with medication, and she reported to feeling much better and more stable moods. She stated that she was doing well." Id. (citing T. at 1172, 1200, 1211). The ALJ also explained that "Dr. Stang noted during his own evaluation of [plaintiff] that while she was anxious and obsessed with her Social Security case, her thought process was organized and goal directed, insight was intact, and judgment was intact." Id. (citing T. at 1604). It was the ALJ's duty to resolve conflicts in the record and the treatment notes reflecting intact concentration and persistence provide substantial evidence in support of the ALJ's determination. See Juliana Jolean A. v. Kijakazi, No. 5:20-CV-1268 (BKS), 2022 WL 595361, at *11-12 (N.D.N.Y. Feb. 28, 2022) (finding "that substantial evidence supports the ALJ's evaluation of [an] opinion regarding [the p]laintiff's limitations in off-task time and

absenteeism[]" in part, because "the ALJ found that the opinion was not supported because '[n]early all of the exams of the claimant by [the authoring providers] have been essentially within normal limits during the period at issue.'  Indeed, [one provider] regularly described [the p]laintiff as alert and oriented and with appropriate behavior.").

Plaintiff asserts that the following supports the providers' conclusions that plaintiff would be absent from work: her "bilateral cervical radiculopathy; numbness, tingling and wakens in her arms and hands; bilateral lumbar sacroiliitis; numbness, tingling and weakness in her legs, the numerous symptoms from fibromyalgia; the MRIs confirming the neck and low back torn and herniated discs and radiculopathy." Dkt. No. 12 at 19. However, none of the opinions or treatment notes correlate plaintiff's diagnoses or related symptoms to her being absent from work.  See T. at 1170-71, 1456-57, 1266, 1598, 1604-07.  Therefore, the ALJ did not err in discounting that portion of the opinions.  Cf. Juliana Jolean A., 2022 WL 595361, at *11 ("[T]he providers did not state that [the p]laintiff actually experiences [a] side effect [from her medication such as sedation] or present other objective medical evidence regarding [the p]laintiff's need to be off-task or absent from work.").  The ALJ's RFC and decision not to provide explicit time off task or absenteeism limitations is supported by substantial evidence where the records document intact concentration and attention, she had a "very high level of daily activity[,]" and there were little to no explanations as to how plaintiff's physical or mental limitations would cause her to be absent from work.  See Amanda R. v. Comm'r of Soc. Sec., 556 F. Supp. 3d 145, 156 (N.D.N.Y. 2021) (citations and quotation marks omitted) ("The ability to maintain a regular schedule falls under the category of concentration and persistence.  Thus, one place an ALJ can look to analyze this issue is to other opinions

in the record that examine the overall severity of a claimant's mental impairments in the relevant functional area.  Another place an ALJ can look is to a claimant's activities of daily living, which sometimes shed light on the ability to make and keep a routine and/or a daily schedule.").

### 3.  ALJ's Manipulative and Walking Limitations

Plaintiff argues that the ALJ's RFC determination limiting plaintiff to "walking three hours total was created out of whole cloth by the ALJ with nothing to support it." Dkt. No. 12 at 17.  Similarly, plaintiff asserts that the ALJ's conclusion to limit plaintiff to "frequent handling, fingering, feeling []" is not supported by substantial evidence.  Id. at 22.  As to both limitations, plaintiff contends that the ALJ did not provide "good reasons" for discounting her treating providers' opinions.  Id. at 16-17, 23-26.  Finally, plaintiff contends that the ALJ mischaracterized plaintiff's activities of daily living.  See id. at 28-29.  The Commissioner contends that the ALJ appropriately considered the opinions and discounted part of the treating providers' determinations based on the evidence of record and plaintiff's activities of daily living.  See Dkt. No. 15 at 12-17, 21-25.

### a.  ALJ Decision

As to plaintiff's manipulative limitations, the ALJ determined that plaintiff "can frequently reach in all directions at shoulder level.  She can occasionally reach overhead.  She can frequently finger, handle, and feel."  T. at 24.  The ALJ noted that plaintiff "complained of numbness, tingling, burning, and the lack of strength in her wrists and hands and asserted that she cannot write, do her hair, or perform activities that require holding her arms up."  Id. at 25.  The ALJ stated that plaintiff

"continues to experience numbness and tingling in her hands daily, which affects her ability grasp objects.  [Plaintiff] struggles to zip and button things."  Id.

In 2018, Dr. Gould determined that plaintiff could frequently reach in all directions other than overhead, and feel, and occasionally reach overhead, handle, finger, push, pull.  See T. at 1167.  The ALJ stated that Dr. Gould's limitation on plaintiff's ability to handle bilaterally, [w]as [] limitations are inconsistent with the record as a whole, including [plaintiff's] very high level of daily activity, detailed below."  Id. at 26.  In 2020, Dr. Gould determined that plaintiff "could occasionally engage in manipulative activities except frequently feel[.]"  Id. at 26, 1453.  The ALJ explained that "the EMG/nerve conduction study showed only very mild left median neuropathy at the wrists and no abnormalities on the right, which does not support the degree of manipulative restrictions."  Id. (citing T. at 1459).

In 2018 and 2020, Dr. Taylor determined that plaintiff could occasionally reach, handle, finger, feel, push, and pull.  See T. at 1262, 1594.  The ALJ did not specifically mention the manipulative limitations in discounting Dr. Taylor's opinion but determined that his opinion was contradicted by the updated diagnostic images in records, which showed at most minimal abnormal findings and that the claimant's condition remained relatively stable during the period under review."  Id. at 27 (citing T. at 1459, 1581, 1584).  The ALJ also relied on plaintiff's activities of daily living and noted "that Dr. Taylor is not providing [plaintiff] treatment for her fibromyalgia, chronic pain, or mental disorder, which are the conditions that are the basis of his limitations."  Id. (citing T. at 1576, 1599).

In reviewing the subjective and objective evidence in the record, the ALJ stated that plaintiff "complained of bilateral numbness in her upper extremities, and underwent a left carpal tunnel release surgery on September 26, 2016 and a right carpal tunnel release surgery on October 24, 2016.  She also treated her bilateral shoulder pain with injections."  T. at 28-29 (citing T. at 883-87, 1238).  The ALJ determined that "the objective evidence in record supports the manipulative abilities outlined" in the RFC.  Id. at 29.  The ALJ explained that "[f]ollowing carpal tunnel release, [plaintiff] has continued to complain of weakness in both hands with intermittent and activity related sensory changes, primarily affecting the long, ring, and small fingers of both hands. However, she has maintained full motion of the fingers on both hands."  Id.  The ALJ continued,

> [t]here is no warmth, erythema, or swelling of either hand.  She has full flexion and extension of the fingers of both hands, and opponens strengths is normal with no atrophy.  Sensory testing to light touch showed a deficit to the fifth finger on the right and the ring and small fingers on the left with no split to the ring finger.  Tinels produced local paresthesias proximal to the flexor crease and to the rest bilaterally with no distal paresthesias to the median innervated digits.

Id. (citing T. at 1237-38).  The ALJ explained that despite plaintiff's "complaints of pain along the radial aspect of the wrist continuing into the extensor surface of the thumb, she had no loss of motion of either arm in September 2018.  There was no warmth, erythema, or swelling.  On Finkelstein's test, [plaintiff] achieved relief of her pain with this searching motion."  Id.  The ALJ also reiterated the range of motion findings, stating,

> Active range of motion measured by a goniometer on three occasions showed a dorsiflexion of 63 degrees, 57 degrees, and 65 degrees on the right while palmar flexion was 73 degrees, 67 degrees, and 58 degrees. Left dorsiflexion was 64 degrees, 71 degrees, and 63 degrees with palmar flexion of 62 degrees, 64 degrees, and 59 degrees. Radial abduction

45

range of motion in both IP and MP joints of the palms appeared to be full
and symmetrical from left to right.

Id. (citing. T at 1237-38).

The ALJ explained that plaintiff "attended physical therapy for bilateral de
Quarvain's and reported good days and bad days; however, her pain was improved
overall with therapy.  [She] also reported that her hands feel better when she takes
Aleve."  T. at 29 (citing T. at 615, 721-27).  The ALJ reiterated the 2016 consultative
examination findings that plaintiff's "hand and finger dexterity was intact, and her grip
strength was full bilaterally."  Id. (citing T. at 723).  The ALJ also reviewed the more
recent records relating to plaintiff's carpal tunnel and manipulative abilities.  For
example, the ALJ states that "[i]n In November 2017, [plaintiff] received an
injection for de Quarvain's pain and had a positive Finkelstein's test.  Motor and sensory
examination results were normal, it was determined that the claimant carpal tunnel
syndrome had resolved other than some soreness in her palms."  Id. at 29-30 (citing T.
at 1239).  Then, the ALJ explained that "[i]n January 2018, [plaintiff] complained of
some pain about her left wrist reported that her hand numbness had resolved."  Id. at 30
(citing T. at 1238).  The ALJ noted that "[i]n June and July 2020, the Spurling's test was
negative bilaterally, strength was full in the upper extremity, and deep tendon reflexes
were +2 bilaterally in the upper extremities.  In September [], she had full motor strength
in her upper extremities except 4/5 in her left bicep and tricep and 4/5 in her grip
strength."  Id. (citing T. at 1495, 1515, 1620).  The ALJ concluded that "[t]hese clinical
findings do not support [plaintiff's] allegation that she has substantial difficulties handling
and grasping objects, and contradict the significant manipulative restrictions identified
by [plaintiff's] medical providers."  Id.

As to plaintiff's walking limitations, the ALJ limited her to walking "for three hours in an eight-hour workday for 30 minutes at one time with a brief stretch break."  T. at 24. In Dr. Gould's 2018 and 2020 opinions, he noted that plaintiff could walk for thirty minutes at one time and for one hour in an eight-hour workday.  See id. at 1166.  In Dr. Taylor's 2018 and 2020 opinions, he indicated that plaintiff could walk for one hour at a time for one hour in an eight-hour workday.  See id. at 1261, 1593.  Also referenced by the ALJ was Dr. Taylor's physician certification form related to his findings and he noted that plaintiff can walk for less than one hour at a time.  See id. at 27, 1599.  The ALJ explained that Dr. Taylor noted that plaintiff "was engaging in childcare, walking her dogs, running to the grocery store, and preparing meals."  Id. at 27, 1576.  The ALJ also noted that plaintiff reported "hiking on very high peaks."  Id. at 27, 144, 150, 1204.

The ALJ stated that "[t]he standing, walking, and sitting abilities outlined [in the RFC] are supported by the physical examinations in record."  T. at 30.  As explained when discussing plaintiff's fibromyalgia, the ALJ extensively reviewed the consultative examination findings, May 2020 emergency room records showing "mild abnormal findings[,]" August and September 2020 strength testing, and plaintiff's complaints that sitting and standing aggravate her pain.  Id. (citing T. at 721-727, 1318, 1323-34, 1461, 1619); see supra at 15-17.

The ALJ also explained that plaintiff's "described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations."  T. at 32.  The ALJ stated that plaintiff "admitted that she cooks three times per week, cleans three times per week, does laundry weekly, shops two times per month, and performs childcare every day.  She showers three to four times per

47

week and dresses daily.  She reads and walks her dogs." Id. (citing T. at 722).  The ALJ also noted that plaintiff "also admitted to walking in the woods with friends.  The record also references a camping trip and the vigorous activity of four wheeling." Id. (citing T. at 750, 770, 821, 838).  The ALJ explained that "[a]lthough [plaintiff] disputed that she went camping, she acknowledged that she drove into the park, set up the tent, sat around the fire, and relaxed, which is consistent with the nature of camping.  She also testified that she continues to be able to set up tents." Id.  The ALJ noted that plaintiff "also floats around a pond in kayaks and lunches with her friend, which again suggests that she is not socially isolated and able to engage in hobbies." Id.

The ALJ stated that "[i]n August 2017, [plaintiff] stated that she was on her way to go hiking, and confirmed that she was becoming more active.  At the hearing, she acknowledged that she went camping on flat ground with a friend following carpal tunnel release.  [Plaintiff's] marijuana use indicates that she retains the use of her hands to manipulate small objects." Id. (citing T. at 960, 1200, 1204).  The ALJ explained that "[a]lthough she testified that she stopped smoking in 2015, as discussed above, there is no indication that her manipulative abilities deteriorated since she stopped.  [Plaintiff] also admittedly manages a small farm." Id. (citing T. at 855).  The ALJ stated that plaintiff "admitted that she had chickens on a farm, and while she ultimately got rid of them, at the time of the report, it was true." Id. at 32-33.  "In April 2020, [plaintiff] reported to walking daily.  Dr. Stang encouraged [her] to go out of her house and walk with her dog as much as possible." Id. (citing T. at 1396, 1606).  Finally, the ALJ explained that "[a]t the hearing, she acknowledged to performing some household

chores, and that she is able to walk her dogs around a baseball fields.  She also indicated that she was able to run errands by herself."  Id.

### b.  Analysis

As an initial matter, plaintiff asserts that the ALJ erred in relying on an EMG study from five years prior to the ALJ decision to discount Dr. Gould's manipulative limitations. See Dkt. No. 12 at 16 (citing T. at 23, 609-14).  However, the treatment note that the ALJ cited to conclude that "the EMG/nerve conduction study showed only very mild left median neuropathy at the wrists and no abnormalities on the right[,]" indicates exactly that.  T. at 26.  The treatment note reads, "5/4/020 EMG done prior to the surgery showed only very mild left median neuropathy at the wrists, and no abnormalities on the right[.]"  Id. at 1459.  Therefore, the ALJ did not misstate the record that she relied on.

The ALJ's RFC determination does not need to mirror any one medical opinion. See Zacharopoulos v. Saul, 516 F. Supp. 3d 211, 229 (E.D.N.Y. 2021) (affirming the ALJ's decision where "the ALJ formulated an RFC for plaintiff that was consistent with the administrative record in this case, even though there was no specific medical opinion that fully mirrored the ALJ's RFC determination."); see also Angela G. v. Comm'r of Soc. Sec., No. 5:19-CV-1521 (ML), 2021 WL 22609, at *6 (N.D.N.Y. Jan. 4, 2021) (collecting cases) ("In formulating a plaintiff's RFC, an ALJ does not have to adhere to the entirety of one medical source's opinion.").  This Court has recently explained that an ALJ's determination can be based on substantial evidence absent any medical opinion providing the specific restrictions reflected in the RFC.  See Todd E. O. v. Comm'r of Soc. Sec., No. 5:20-CV-1046 (CFH), 2022 WL 326629, at *13-14 (N.D.N.Y. Feb. 3, 2022) (collecting cases).

However, the ALJ cannot interpret raw medical data.  See Hazlewood v. Comm'r of Soc. Sec., No. 6:12-CV-798 (DNH), 2013 WL 4039419, at *5 (N.D.N.Y. Aug. 6, 2013) ("The ALJ is not qualified to assess a plaintiff's RFC on the basis of bare medical findings, and where the medical findings in the record merely diagnose a plaintiff's impairments and do not relate those diagnoses to a specific RFC, an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence.") (citation and footnote omitted); Melanie M. v. Comm'r of Soc. Sec., No. 5:19-CV-571 (CFH), 2020 WL 4335495, at *6 (N.D.N.Y. July 28, 2020) (quoting Sonjah H. v. Berryhill, No. 3:17-CV-1324 (CFH), 2019 WL 936630, at *10 (N.D.N.Y. Feb. 25, 2019)) ("The ALJ cited [the] plaintiff's MRI, X-Ray, nerve conduction study results, and pain management treatment notes.  However, none of those medical records, either together or separately, establish whether plaintiff could sit for six hours or stand or walk for two hours in an eight-hour workday, as required to perform sedentary work.  Notably, the record is also devoid of any medical opinion evidence concerning any durational limitations or ability to perform postural tasks.  Rather, it appears that the ALJ substituted her own judgment and attempted to interpret the raw medical data, such as the findings of "negligible disc degeneration" in plaintiff's lumbar spine x-rays, in reaching her RFC determination, which 'the ALJ is precluded from doing.'").

The Second Circuit has recently reiterated the "basic principles" of a Court's review of an ALJ's decision: "the ALJ's RFC conclusion need not perfectly match any single medical opinion in the record, so long as it is supported by substantial evidence." Schillo v. Kijakazi, 31 F.4th 64, 78 (2d Cir. 2022).  In Schillo, one of the plaintiff's

treating provider's opined that the plaintiff could sit for ten minutes, stand for twenty minutes, walk one city block, and "use her right hand for gross manipulation for 20% of the workday and for fine manipulation for 10% of the workday, but can never use her left hand for gross or fine manipulation[.]"  Id. at 73.  The ALJ discounted the treating provider's opinion and instead limited plaintiff to being able to "sit for six hours, and stand and/or walk for six hours in an eight-hour day . . . frequently handle, finger, and feel with her dominant right hand, and she could occasionally handle, finger, and feel with her non-dominant left hand."  Id. at 72.  The Court explained that because "the ALJ accorded the treating physicians' opinions lesser and not *no* weight, she still considered their conclusions to assess [the plaintiff's] RFC.  The ALJ also looked to the other sources in the administrative record, including MRI results, x-ray results, and notes documenting [the plaintiff's] visits with other medical providers."  Id. at 78.

In reviewing the District Court opinion that the Second Circuit in Schillo affirmed, Magistrate Judge Dancks reiterated the ALJ's decision, and the records related to the plaintiff's manipulative limitations.  See Brenda Lynn S. v. Comm'r of Soc. Sec., No. 5:19-CV-0999 (TWD), 2020 WL 5802272, at *11 (N.D.N.Y. Sept. 29, 2020), aff'd sub nom. Schillo, 31 F.4th at 79-80.  Judge Dancks noted that the plaintiff's treating provider's opinion limiting the plaintiff to "perform gross hand manipulation for 20 percent of the day, fine manipulation for 10 percent of the day, and reaching for 10 percent of the day with her right hand" was unsupported by examinations showing "mild tremor symptoms in her dominant hand, and mild to moderate symptoms in her non-dominant hand[]" and "[u]pper extremity exams showed full strength bilaterally, good

muscle consistency, and non-tender and non-swollen joints." Id. at *7, *11.  Further, the Court stated that

> [t]he ALJ also relied on unmarkable brain and spine MRIs and EMG/nerve studies as evidence to support the RFC.  The ALJ explained that [the p]laintiff's medical examinations showed only slightly reduced motor strength and only intermittent findings of pain in her cervical spine.  The ALJ cited to specific record evidence documenting mild to moderate tremors but minimal mild functional impairments attendant to those tremors.  For example, [the p]laintiff had minimal impairment in drawing and writing; intact hand and finger dexterity; and grip strength 5/5 bilaterally.

Id. (citations omitted).  Thus, Judge Dancks concluded that "[t]he ALJ's decision demonstrates adequate consideration of the regulatory factors in weighing the opinions of record and affording some weight to [the p]laintiff's treating providers' opinions." Id. at *12.  The Second Circuit affirmed the decision, explaining that "[u]nder our very deferential standard of review, we cannot say that no reasonable factfinder could have reached the [ALJ's] same conclusion[.]" Schillo, 31 F.4th at 78 (citation omitted).

In light of Schillo, the Court finds that the ALJ's RFC determination related to plaintiff's manipulative limitations is supported by substantial evidence.  The consultative examiner determined that plaintiff had no restrictions in her ability feel, finger, or handle.  See T. at 724.  In both his 2018 and 2020 opinions, Dr. Gould determined that plaintiff could frequently feel but only occasionally handle or finger.  See id. at 1667, 1453.  In both opinions, Dr. Taylor determined that plaintiff could only occasionally finger, feel, and handle.  See id. at 1262, 1594.

The ALJ extensively reviewed the record and discounted the treating provider's "occasional" manipulative limitations because of an "EMG/nerve conduction study[,]" "updated diagnostic images[,]" and plaintiff's activities of daily living.  Id. at 26-27.  The

ALJ also cited treatment records showing "full motion of the fingers on both hands[,]" results from Tinel's, Finkelstein's, and Spurling's tests, active ranges of motion, and "4/5 [] grip strength."  T. at 29-30.  These records provide substantial evidence in support of the ALJ's RFC determination limiting plaintiff to being able to "frequently finger, handle, and feel."  Id. at 24.  Specifically, the ALJ gave Dr. Gould's 2018 opinion "considerable weight[,] his 2020 opinion "partial evidentiary weight[,]" and Dr. Taylor's "limited weight[.]"  Id. at 25-26.  As such, the ALJ "still considered their conclusions to assess [plaintiff's] RFC."  Schillo, 31 F.4th at 78.  Further, the most recent records showed that plaintiff had full strength in her upper extremities "except 4/5 in her left bicep and tricep and 4/5 in her grip strength[.]"  T. at 30, 43F/38, 58; 53F/4.  Similar to the plaintiff in Schillo, plaintiff's most recent EMG study also "showed only very mild left median neuropathy at the wrists and no abnormalities on the right."  Id. at 31, 1459; see Brenda Lynn S., 2020 WL 5802272, at *11.  Finally, plaintiff testified that she cooks, cleans, does laundry, grocery shops, kayaks, camps, raised chickens, and takes care of her dogs.  See T. at 129-30, 144-49.  These activities all involve manipulation of the upper extremities and provide substantial evidence for the ALJ's RFC determination.

To be sure, had the ALJ relied on only plaintiff's activities of daily living to discount the treating providers' opinion, remand would be necessary.  See Cassandra K. v. Comm'r of Soc. Sec., No. 5:18-CV-86 (ATB), 2019 WL 1115673, at *8 (N.D.N.Y. Mar. 11, 2019) ("In supporting this position, the ALJ emphasized that, during the September 2017 hearing, the plaintiff, 'without prompting . . . picked up her pill bottle and held it up with her left hand.'  The fact that plaintiff could grasp and lift a pill bottle with her left hand hardly provides significant evidence supporting an RFC that plaintiff

could 'frequently handle, finger, and feel with her left hand' during the course of an eight-hour workday."). However, the ALJ also relied on the normal EMG results and intact strength and sensation shown in the treatment records. See Antoine T. v. Comm'r of Soc. Sec., No. 3:18-CV-0232 (CFH), 2019 WL 2327937, at *8, *10 (N.D.N.Y. May 31, 2019) (affirming the ALJ's decision where the "[t]he ALJ concluded that [] diagnostic images did not show findings so severe as to support [an] opinion" and "[r]ather than relying solely on [the consultative examiner's] opinion (and any such 'vague' limitations therein) to formulate the RFC or relying on said opinion . . . the ALJ adequately considered the opinions and the other evidence of record -- including [the p]laintiff's testimony, reports, and treatment -- to determine the RFC."). As such, the Court finds no error in the ALJ's RFC determination related to plaintiff's manipulative limitations.

The Court comes to the same conclusion regarding the ALJ's walking limitations. The ALJ gave Dr. Gould's 2018 opinion "considerable weight[,]" his 2020 opinion "partial evidentiary weight[,]" gave Dr. Taylor's opinions no controlling or significant weight, and gave Dr. Cole's consultative examination "some weight." T. at 25-27. The ALJ limited plaintiff to walking and standing for thirty minutes at one time which is identical to Dr. Gould's opinions. See id. at 24, 1166, 1452. However, Dr. Cole found that plaintiff had no limitations in walking and Drs. Taylor and Gould both determined that plaintiff could walk no more than one hour in an eight-hour day in all four of their opinions. See T. at 724, 1166, 1261, 1452, 1593. No physician determined that plaintiff could walk for three hours in an eight-hour day. See id. at 724, 1166, 1261, 1452, 1593.

The ALJ discounted Dr. Taylor's and Dr. Gould's walking limitations because of the normal consultative examination, plaintiff's treatment notes, and her activities of daily living.  <u>See</u> T. at 25-27.  As explained by the ALJ, the treatment records show intact strength and sensation, normal gait and stance, "negative straight leg raise test bilaterally," no tenderness, and no use of assistive devices.  <u>Id.</u> at 26, 30.  None of the records the ALJ cites state that because of plaintiff's normal sensation or negative straight leg tests, she would be able to walk for three hours total out of an eight-hour day.  <u>See id.</u> at 1459, 1581, 1584, 1619.  It is for this reason that plaintiff argues that the ALJ's determination was made form "whole cloth[.]"  Dkt. No. 12 at 17.

The ALJ does not need to rely on a medical opinion to determine plaintiff's RFC.  <u>See</u> <u>Natasha M. v. Comm'r of Soc. Sec.</u>, No. 1:20-CV-1142 (WBC), 2021 WL 5138345, at *3 (W.D.N.Y. Nov. 4, 2021) (citing <u>e.g.</u>, <u>Cook v. Comm'r of Soc. Sec.</u>, 818 F. App'x 108, 109-110 (2d Cir. 2020) (summary order) ("[A]lthough there was no medical opinion providing the specific restrictions reflected in the ALJ's RFC determination, such evidence is not required when 'the record contains sufficient evidence from which an ALJ can assess the [plaintiff's] residual functional capacity.' . . . Here, the treatment notes were in line with the ALJ's RFC determinations.")).  Nevertheless, the ALJ gave Dr. Gould's opinions, "considerable" and "partial evidentiary weight" and Dr. Taylor's opinions "limited weight."  T. at 25-27.  The cases that have found that an ALJ improperly interpreted raw medical data to come to an RFC determination are ones in which the ALJ either did not have a functional limitation opinion to base the determination on, or the ALJ gave the only opinions of record "little weight[.]"  <u>Manchester v. Colvin</u>, No. 7:13-CV-00308 (DNH), 2014 WL 4983496, at *4-5 (N.D.N.Y.

Oct. 6, 2014) ("It is unclear how ALJ Greener reached [her] conclusions in her written decision given that she rejected the medical opinions of both" of plaintiff's providers."); Smith v. Comm'r of Soc. Sec., No. 5:17-CV-0488 (GTS), 2018 WL 1684337, at *5-6 (N.D.N.Y. Apr. 5, 2018) (explaining that the plaintiff's primary provider "did not fill out the functional assessment or capacity portions of the questionnaire" and "[t]he only other functional assessment of record was made by a Single Decision Maker at the initial determination level[.]"); Lowe v. Colvin, No. 6:15-CV-06077 (MAT), 2016 WL 624922, at *7 (W.D.N.Y. Feb. 17, 2016) ("Because Dr. Sheehan is the only medical opinion in the record to assess [the p]laintiff's ability to lift and carry with specificity, and because the ALJ ultimately gave little evidentiary weight to that opinion, the Court is left with the circumstance of the ALJ interpreting raw medical data to arrive at a residual functional capacity determination, without the benefit of an expert medical opinion.  In short, the ALJ's RFC determination that [the p]laintiff can lift up to 20 pounds is not supported by substantial evidence."); Haddad v. Berryhill, No. 3:16-CV-2023 (WIG), 2018 WL 2045997, at *4 (D. Conn. May 2, 2018) ("The record does not contain any opinion evidence or a medical statement from a treating or examining source as to plaintiff's functional limitations.  Even the state agency consults did not review the evidence in its entirety, as some records indicating additional impairments were not available to them. The Court is then left without a clear indication of how the ALJ reached the RFC determination without resorting to impermissible interpretation of raw medical data.").

Here, the ALJ relied on, although to varying degrees, to Dr. Gould's and Dr. Taylor's opinions, the 2016 consultative examination, plaintiff's subjective complaints of her pain being exacerbated by standing and sitting, and 2020 treatment records

showing intact strength and sensation, and normal gait and posture.  See T. at 25-30, 721-27, 1318, 1323-24, 1396, 1461, 1619.  It was appropriate for the ALJ to determine that plaintiff was limited in her ability to walk but not to the degree opined by Drs. Taylor and Gould.  See Brenda Lynn S., 2020 WL 5802272, at *13 ("Considering the ALJ's detailed analysis of [the p]laintiff's medical history, the relevant medical opinions, [the p]laintiff's testimony, and her activities of daily living, this Court concludes the RFC determination was supported by substantial evidence.").  Even if the Court would have come to a different conclusion had it been in the ALJ's shoes, the Court "may vacate the agency's disability determination only if it is based on legal error or unsupported by 'substantial evidence'—that is, if no reasonable factfinder could have reached the same conclusion as the ALJ."  Schillo, 31 F.4th at 69.  As the ALJ relied on the treating providers' opinions and extensively discussed the records indicating that a more restrictive limitation is unsupported, remand is not warranted.

To the extent plaintiff challenges the ALJ's consideration of plaintiff's activities of daily living, the Court finds no reversible error.  To be sure, despite the ALJ's reliance on plaintiff's walks and hikes, plaintiff testified that she only walks her dog for about a mile[,]" after she walks, she has to come and sleep for two to three hours, she "will go walk my dogs at the park, at a flat surface.  [She is] not hiking.  [She is] walking around a baseball field."  Id. at 129, 1250.  When asked how long she can walk before stopping, plaintiff stated, "15 minutes we'll stop.  I'll let them play, like I go to certain parks where I know they could play at certain place. . . .  I sit on the bench while they go int the creek[,] and the baseball field is "no longer than one mile.  [] I don't even do the whole thing."  Id. at 131-32.  In total, plaintiff states that she is out with the dogs for "[h]alf hour,

57

45 minutes, sometimes less." Id. 132.  Plaintiff also used to hike the high peaks and when the ALJ asked for clarification on this, plaintiff explained that she "never hiked another high peak after July 2016." Id. at 144.  She also stated that she walked five miles because she got lost in 2017 but that she was in pain and tired after.  See id. at 149-50.  Lastly, she testified that she does not walk two to three miles but "can drive to the park, and sit on a bench, walk a little bit, you know, sit down." Id. at 152.

Plaintiff's testimony that she stopped walking and hiking as much after 2016 and 2017 seemingly corresponds to the consultative examiner's 2016 no-limitations finding as to walking and the treating providers' 2018 and 2020 opinions that plaintiff can walk for no more than one hour out of an eight-hour day.  See T. at 724, 1166, 1261, 1452, 1593; see Kelly W. v. Kijakazi, No. 3:20-CV-00948 (JCH), 2021 WL 4237190, at *10 (D. Conn. Sept. 17, 2021) (quoting Eldridge v. Colvin, No. 15-CV-3929 (NSR/PED), 2016 WL 11484451, at *15 (S.D.N.Y. June 29, 2016), report and recommendation adopted, 2016 WL 6534258 (S.D.N.Y. Nov. 2, 2016) ("An ALJ may not rely on a claimant's daily activities to discredit her while 'wholly ignor[ing] the qualifications that [the p]laintiff placed on [her] ability to engage in [those] activities.'").  The ALJ also did not explicitly acknowledge plaintiff's explanation for how long she can walk.  However, these limitations have been accounted for where the ALJ limited plaintiff to walking or standing for only thirty minutes at a time.  See T. at 24.  Plaintiff did not testify that throughout an eight-hour day, she can only walk for one hour.  See id. at 129-52.  Rather, she testified that she walks daily, runs errands, goes to the grocery store, goes camping, and will often alternate between sitting and standing or sit for longer periods of time such as when drinking coffee with her mother or camping with her friend.  See id. at 129-32,

145, 148.  These activities support the ALJ's determination to limit plaintiff to sitting for six hours, standing and walking for thirty minutes at a time and three hours total, and having brief stretch breaks.  See id. at 24.  Accordingly, in light of the "very deferential standard of review[]" that the Court is obligated to apply to its review of the ALJ's decision, the Court concludes that the ALJ's RFC determination is supported by substantial evidence.  Schillo, 31 F.4th at 78.


## VI.  Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby:

**ORDERED**, that the Commissioner's decision is **AFFIRMED**; and it is further

**ORDERED**, that the Commissioner's cross-motion for judgment on the pleadings (Dkt. No. 15) is **GRANTED**, and plaintiff's motion for judgment on the pleadings (Dkt. No. 12) is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court amend plaintiff's name in the case caption; and it is further

**ORDERED**, that the Clerk of the Court serve copies of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: June 14, 2022
       Albany, New York

Christian F. Hummel
U.S. Magistrate Judge